IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

GLOBUS MEDICAL, INC.,                      :
                Plaintiff,       :
                               :       CIVIL ACTION
      v.                                    :       NO. 14-3105
                               :
VORTEX SPINE, LLC et al.,                  :
                Defendants.      :

Jones, II      J.                                            September 30, 2016

## MEMORANDUM

Upon consideration of Plaintiff's Motion for Partial Summary Judgment, (Dkt No. 76), Memorandum of Law in Support thereof, (Dkt No. 76-2 [hereinafter MSJ]), and Statement of Undisputed Material Facts, (Dkt No. 76-3 [hereinafter SOF]), Defendants' Response, (Dkt No. 83), Memorandum of Law in Support thereof, (Dkt No. 84 [hereinafter Resp.]), Response to Plaintiff's Statement of Undisputed Material Facts, (Dkt No. 84-10 at 1-34 [hereinafter RSOF]), and Additional Statement of Disputed Material Facts, (Dkt No. 84-10 at 35-80 [hereinafter ASOF]), Plaintiff's Response to Defendants' Additional Statement of Disputed Material Facts, (Dkt No. 92 [hereinafter RASOF]), Plaintiff's Reply Memorandum of Law in Support of its Motion for Partial Summary Judgment, (Dkt No. 96 [hereinafter Rep.]), and Defendants' Sur-Reply Memorandum of Law in Support of its Opposition to Plaintiff's Motion for Partial Summary Judgment, (Dkt No. 97 [hereinafter Sur-Rep.]), and Defendants' Supplemental Memorandum of Law, (Dkt No. 104 [hereinafter Defs' Supp.]), it is hereby ORDERED that said Motion is GRANTED IN PART AND DENIED IN PART for the reasons set forth herein.

### I.      Standard of Law

Under Federal Rule of Civil Procedure 56(a), a court shall grant summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the

affidavits, if any, show that there is no genuine [dispute] as to any material fact and that the moving party is entitled to a summary judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); FED. R. CIV. P. 56(a). "If the moving party meets its burden, the burden shifts to the nonmoving party to go beyond the pleadings and come forward with specific facts showing that there is a genuine issue for trial." *Santini v. Fuentes*, 795 F.3d 410, 416 (3d Cir. 2015) (internal citations and quotation marks omitted).  Therefore, in order to defeat a motion for summary judgment, the non-movant must establish that the disputes are both (1) material, meaning concerning facts that will affect the outcome of the issue under substantive law; and (2) genuine, meaning the evidence must be such that a reasonable jury could return a verdict for the nonmoving party.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Summary judgment is mandated "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322.  "At the summary judgment stage of proceedings, courts do not 'weigh the evidence or make credibility determinations,' but, instead, leave that task to the fact-finder at a later trial if the court denies summary judgment." *Halsey v. Pfeiffer*, 750 F.3d 273 (3d Cir. 2014) (quoting *Petruzzi's IGA Supermarkets v. Darling-Delaware Co.*, 998 F.2d 1224, 1230 (3d Cir. 1993)).

## II.     Background
### a.  Parties and Non-Parties

Globus Medical, Inc. ("Globus") is a publicly held company, founded in 2003. (SOF ¶¶ 1; RSOF ¶¶ 1; ASOF ¶ 8; RASOF ¶ 8; United States S.E.C. Form 10-K, Dkt No. 77, Ex. 1.) James "Jamie" Long was the founder and owner of Vortex Spine, LLC ("Vortex"), formed in 2004 as a Globus Distributor. (ASOF ¶ 1; RASOF ¶ 1; James Long Dep., July 23, 2014, Dkt No.

85, Ex. 1[1] [hereinafter Long Dep.] 36:16-20.) Vortex Spine, LLC was a distributor of medical products manufactured by Globus between 2004 and April 18, 2014. (SOF ¶¶ 10, 12; RSOF ¶¶ 10, 12; Exclusive Distributor Agreement, Dkt No. 77, Ex. 3 [hereinafter EDA]; Ltr. from Globus to James Long, April 23, 2015, Dkt No. 85, Ex. B [hereinafter Termination Ltr.]; Long Dep. 6:9-13, 34:24-35:2, 36:16-37:10.)

Patrick O'Hara and Wallace Schaefer were independent contractors for Vortex and sold spinal implant products to Globus's customers. (SOF ¶ 15; RSOF ¶ 15; ASOF ¶ 59; RASOF ¶ 59; Patrick O'Hara, July 15, 2014, Dkt No. 77, Ex. 8 [hereinafter O'Hara Dep.] 169:18-170:3; Wallace Schaefer, July 14, 2014, Dkt No. 77, Ex. 9 [hereinafter Schaefer Dep.] 71:13-72:8, 76:20-77:4). Such Vortex personnel (1) identified potential customers; (2) developed and fostered customer relationships for continued, repeat business; and (3) coordinated with customers to provide training on the equipment Globus offers. (SOF ¶ 16; ASOF ¶ 16; O'Hara 169:18-170:3; Schaefer 71:13-72:8, 76:20-77:4.) On September 7, 2007, Mr. O'Hara signed a No Competition Non-Disclosure Agreement ("NCND") with Globus that included a one year restrictive covenant relating to products used in spine surgery. (ASOF ¶ 129; RASOF ¶ 129; Dkt No. 85, Ex. M [hereinafter O'Hara NCND].) Vortex and Long are not parties to Mr. O'Hara's NCND Agreement. (O'Hara NCND.) On July 25, 2011, Mr. Schaefer signed a NCND with Globus under the same terms. (ASOF ¶ 130; RASOF ¶ 130; Dkt No. 85, Ex. L [hereinafter Schaefer NCND].) Mr. O'Hara and Mr. Schaefer are not parties to this lawsuit.[2]

---

[1] Portions of the transcript are also docketed at Dkt No. 77, Ex. 2.

[2] On April 30, 2014, Mssrs. O'Hara and Schaefer filed a Petition for Declaratory Judgment, Temporary Restraining Order, Preliminary and Permanent Injunctions ("Petitioner for Declaratory Relief") in the 19th Judicial District, East Baton Rouge Parish, Louisiana. (ASOF ¶ 131; RASOF ¶ 131; Dkt No. 85, Ex. P.) The Court notes that on July 24, 2014, the Court ruled that it would not abstain from or stay this case pending this Louisiana action. (Dkt No. 15.) On August 12, 2015, the Louisiana Court of Appeal, First Circuit, held that both Mssrs. O'Hara and Schaefer were entitled to partial summary judgment as their No Competition Non Disclosure Agreements were not enforceable under Louisiana law. (ASOF ¶ 133;

### b.  The Exclusive Distributor Agreement and its Termination

Mr. Long, on behalf of Vortex, signed an Exclusive Distributor Agreement ("EDA") with Globus beginning on January 1, 2010 and terminating on December 31, 2013. (EDA ¶ 2.1.) The EDA states the following regarding confidentiality and competition:

5.1.1. <u>No Competition-Competing Company</u>. During the Term of this Agreement, neither Distributor nor any of its employees, agents, representatives, nor Principals, nor Principals' immediate family members shall directly or indirectly, become a proprietor, stockholder, director, officer, employee, agent, representative or member of any entity in the continental United States which his engaged in the medical products business; provided that the purchase for investment of not more than five (5%) percent of the total capital stock of such competing enterprise or business whose stock is publicly traded shall not constitute a violate of this Section 5.

5.1.2 <u>No Competition-Competing Products</u>. Distributor, nor Principals, nor Principal's immediate family members shall directly or indirectly:

(A) <u>Other Products</u>. During the Term of this Agreement [January 1, 2009-Decembmer 31, 2013], manufacture, sell, market, or deliver any product or participate in any manner in such activities, if such product is manufactured, sold, marketed or distributed by any company or its affiliates engaged in the medical products business without express written consent of Company. Company expressly reserves the right to withhold such consent if it deems it to be in the best interests of the Company, for any reason. The restrictions in this Section 5.1.2(A) shall also apply during the two (2) year period after the termination of this Agreement ("Post-Termination Restriction Period") for any reason whatsoever. However, during the Post-Termination Restriction Period, these restrictions shall only preclude the above activity in the Territory[3] [] with any companies engaged in the spinal products business ("Spinal Products Companies"). For purposes of this Section 5.1, companies engaged in the spinal products business also include companies that are agents or affiliates of companies engaged in providing medical products or services associated with the spine.

(B) <u>Non Compensation</u>. During the Term of this Agreement, accept compensation in any kind from any company or its affiliates engaged in the medical

---

RASOF ¶ 133; Dkt No. 85, Ex. T.) On November 30, 2015, the Supreme Court of Louisiana denied Globus's writ appealing the Louisiana First Circuit Opinion. (Defs' Supp. at 2.) Thus, the Louisiana Court of Appeal Order that invalidated Mssrs. O'Hara and Schaefer's NCND Agreements is a final Order.

[3] The "Territory" is the seven territories defined in Exhibit A of the EDA: New Orleans East, Houma/Thibodeaux, New Orleans West, Baton Rouge, Northshore, Mississippi Gulf Coast, Lafayette/Lake Charles. (EDA Ex. A.)

products business, without the express written consent of Company. During the Post-Termination Restriction Period, this restriction shall only preclude compensation from any Spinal Products Companies for activity or services rendered or related to the Territory.

(C) <u>Employee/Distributor Recruitment</u>. During the Term of this Agreement and the Post-Termination Restriction Period, induce or influence or attempt to induce or influence, any person engaged as an employee or agent of Company at the time this Agreement terminates, or within the last twelve months preceding the Agreement termination, to terminate his/her relationship with the Company.

(D) <u>The provisions of this Section 5</u>.1.2 [*sic*] shall be in addition to the provisions of the No Competition and Non Disclosure Agreement executed by Principal(s) pursuant to 5.5, which is incorporated here by reference.

\*\*\*

5.5    <u>Distributor and Employee NCND Agreements</u>. Distributor shall require each Principal, employee, agent or sales representative who participates in the promotion or sale of Products to execute the No Competition and Non-Disclosure Agreement ("NCND Agreement") in the form of the NCND Agreement template contained in Exhibit D. Distributor agrees to assign all of its rights and benefits under any such NCND Agreements to Company, at Company's request. Distributor shall not cause any of its Principals, employees, agents or sales representatives to enter into any agreement contrary to, or that would undermine, the benefits and protections contained in the NCND Agreement…

5.6    <u>Separate Agreement and Survival of Section 5</u>. The provisions of this Section 5 constitute a separate agreement and shall survive the expiration or sooner termination of this Agreement.

\*\*\*

10.7    <u>Entire Agreement</u>. This Agreement, and any exhibits hereto, constitutes the entire Agreement between the parties relating to the matters covered by this Agreement, supersedes all prior agreements, whether written or oral, and shall control over any other statement, representation or agreement by the Company.

(EDA ¶¶ 5.1, 5.5-5.6, 10.7.)

**EXHIBIT D**
**EXCLUSIVE DISTRIBUTOR REPRESENTATIVE**
**NO COMPETITION AND NON-DISCLOSURE AGREEMENT**

\*\*\*

**NO COMPETITION & NO SOLICITATION COVENANT**

1.1    Competitive Activity. For purposes of this NCND Agreement, Competitive Activity ("Competitive Activity") shall be defined as participation in, performance of services for, employment by, ownership of any interest in, or assistance, promotion or organization of, any person, partnership, corporation, firm, limited liability company, association or other business entity that manufactures, sells, markets or distributes products or services used in spine surgery ("Competing Company"); provided that the purchase for investment of not more than five (5%) percent of the total capital stock of such Competing Company whose stock is publicly traded shall not constitute a Competitive Activity.

1.2    No Competition Period. For purposes of this NCND Agreement, the No Competition Period ("No Competition Period") shall be defined as the time period encompassing both the Agency Agreement[4] Term[5] and the 12-month period immediately after the termination of the Agency Agreement.

1.3    No Competition or Solicitation Covenant. Agent agrees not to engage in any Competitive Activity with any Hospitals[6] or Medical Personnel[7] during the No Competition Period in the NCND Territory.[8] Furthermore, during the No Competition Period, Agent agrees not to directly or indirectly, either for the Agent's benefit or the benefit of another entity, solicit, call on, interfere with, or attempt to divert, entice away, sell to or market to any customer, Hospital or Medical Personnel in the NCND Territory.

1.4    No Solicitation of Company's Agents or Employees. During the No Competition Period, Agent agrees not to directly or indirectly, either for the Agent's benefit or another entity, employ or offer to employee in any capacity; contact or

---

[4] The "Agency Agreement" is the "Agents performance of services and receipt of compensation from the Company…whether or not a written agreement exists between the Agent and the Company governing said services and compensation." (NCND ¶ C.)

[5] The "Agency Agreement Term" is "the time period during which the Agent performs said sales and distribution services on behalf of the Company." (NCND ¶ D.)

[6] "Hospitals" are "hospitals, surgery centers, medical centers and other health care facilities that purchase Products and the location at which Medical Personnel perform services related to the implantation and other…handling and usage of the Products." (NCND ¶ H.)

[7] "Medical Personnel" are "orthopedic surgeons, neuro-surgeons, physicians, nurses and other medical personnel involved in the implantation and other handling and usage of the Products." (NCND ¶ G.)

[8] The "NCND Territory" is "the geographic area assigned to the Agent within the most recent 12 months of the Agency Agreement Term…" (NCND ¶ E.)

recommend for employment with a Competitive Company; contact or recommend for the purposes of entering into a contractual relationship with a Competitive Company; solicit, call on, interfere with, or attempt to divert, or entice away; any individuals who were agents, independent contractors, representatives or employees of the Company or of Globus on the date that the Agency Agreement was terminated or for the 12-month period immediately preceding the termination of the Agency Agreement.

***

4.1    <u>Entire Agreement</u>. This NCND Agreement constitutes the entire agreement between the parties relating to the specific matters covered by this NCND Agreement and supersedes all prior agreements, whether written or oral. No modifications or waiver of any part of this NCND Agreement shall be binding upon either party unless in writing.

(EDA Ex. D [hereinafter NCND] ¶¶ 1.1-1.4, 4.1.)

The parties began negotiating the renewal of the EDA around November 2013. (ASOF ¶ 43; RASOF ¶ 43.) The parties entered into short term extensions of the EDA during these negotiations. (ASOF ¶ 75; RASOF ¶ 75.) These negotiations were unsuccessful and the EDA was terminated at the end of April 2014. (SOF ¶ 31; RSOF ¶ 31; ASOF ¶¶ 45-47; RASOF ¶¶ 45-47; Termination Ltr.)

Defendants dispute the validity of the EDA. Defendants argue that prior and contemporaneous oral agreements between Mr. Long and Rick Kienzele on behalf of Globus (what Defendants refer to as the "EDA Understanding") affected the terms of the EDA as written. (RSOF ¶¶ 18, 21-24; ASOF ¶¶ 14-16, 19; James Long Declaration, Dkt No. 85, Ex. C [hereinafter Long Decl.] ¶¶ 20-23.) Plaintiff argues that any evidence of these purported conversations is irrelevant and inadmissible.

Further, Defendants argue that during the negotiations to renew the EDA prior to the expiration of the EDA, the parties drafted a new agreement that was consistent with the EDA Understanding. (ASOF ¶ 44; RASOF ¶ 44.) Defendants have not produced this draft EDA in evidence. Plaintiff argues that the best evidence rule bars consideration of this alleged draft

EDA. (RASOF ¶ 44.) The parties do not dispute that Plaintiff presented Mr. Long with a different, new EDA, and that Mr. Long rejected the terms of that new EDA on April 18, 2014; this new draft is also not entered into evidence. (ASOF ¶ 55; RASOF ¶ 55.)

### c.   M.I. Spine, LLC

In 2008, Mr. Long founded M.I. Spine, LLC ("M.I. Spine"). (SOF ¶ 18;[9] RSOF ¶ 18;[10] ASOF ¶ 37; RASOF ¶ 7; Long. Dep. 48:24-25.) Thus, M.I. Spine predates the EDA. Between January 2008 and May 2014, M.I. Spine had a total income of $799,909.97. (M.I. Spine, LLC Gross Revenue, Jan. 2008 to May 2014, Dkt No. 77, Ex. 4.) The parties do not dispute that through M.I. Spine, LLC, Mr. Long and his independent contractors sold various medical products to the same doctors as those he serviced on behalf of Globus. (SOF ¶ 19; RSOF ¶ 19; Long Dep. 46:23-72:55; Vanessa Lirette Dep., July 14, 2014, Dkt No. 77, Ex. 5 [hereinafter Lirette Dep.] 48:9-86:16, 89:16-111:18, 124:17-131:20, 140:14-142:12.)

There is no dispute of fact that Defendants sold bone grafting products to Globus's clients produced by companies other than Globus. (ASOF ¶¶ 29, 91-93; RASOF ¶¶ 29, 91-93.) Plaintiff argues that M.I. Spine sold bone grafting and other medical products without Plaintiff's knowledge or consent. (SOF ¶¶ 18-21;[11] RASOF ¶¶ 28-36, 41, 68, 91-93; Schaeffer Dep. 29:16-30:2; Long Dep. 46:23-72:1; O'Hara Dep. 65:25-66:7, 211:21-23.) However, Defendants argue that there remains a dispute of fact as to whether or not Plaintiff consented to these other sales. Defendants argue that any sales of bone grafting products, which, they argue, complemented, but did not "compete," with Globus products, were done with the explicit, and implicit, consent of

---

[9] The Court notes that Plaintiff's Statement of Fact contains two paragraphs titled "18." This paragraph "18" is under the section titled "Defendants' Clear Breach of the Agreement."
[10] In deference to Plaintiff's numbering, Defendants' Response to Plaintiff's Statement of Fact also contains two paragraphs titled "18." This paragraph "18" is under the section titled "Defendants Did Not Breach the EDA."
[11] *See supra* note 2.

Globus. (RSOF ¶¶ 18-21;[12] ASOF ¶¶ 28-36, 41, 68, 91-93.) The EDA requires that Defendants could not sell, market, distribute, or deliver products "sold, marketed or distributed by any company or its affiliates engaged in the medical products business without express written consent of Company." (*See* EDA ¶ 5.1.2(A).) The fact that Plaintiff never provided Defendants with express written consent to sell other medical products is not disputed.

### d.  ProSpine, LLC

In August 2013, Mr. O'Hara founded ProSpine, LLC ("ProSpine"). (SOF ¶ 22; RSOF ¶ 22;[13] ASOF ¶ 109; RASOF ¶ 109; O'Hara Dep. 90:10-12.) Mr. O'Hara, Mr. Schaefer, Ellen Bourgeois (all former Vortex Sales Associates), and Vanessa Lirette, Vortex's former office manager, all worked for ProSpine from April 2014 to at least May 2015. (SOF ¶ 23; RSOF ¶ 23;[14] ASOF ¶ 114; RASOF ¶ 114; Lirette Dep. 34:9-25.)

Mr. Long is not an owner of ProSpine. (ASOF ¶ 110; ¶ RASOF ¶ 110; Long 134:-14-16, 135:7-11; O'Hara 253:12-20; Lirette 35:3-5, 114:14-18.) Ms. Lirette worked for Mr. Long for a period of time after Vortex was closed. (ASOF ¶ 115; RASOF ¶ 115; Long 194:23-195:3; Lirette 34:23-35:2, 111:22-112:8.)

ProSpine sells Biomet products which Spinal Innovations, LLC ("Spinal Innovations") delivers. Spinal Innovations is a distributorship owned and operated by John Robertson and Michael Brown, both former independent contractors of Vortex. (SOF ¶¶ 25, 27; RSOF ¶¶ 25, 27; O'Hara Dep. 101:5-103:23, 105:14-110:3, 135:7-14, 196:5-198:3, 207:2-17; John Robertson, July 22, 2014, Dkt No. 85, Ex. J [hereinafter Robertson Dep.] 48:20-24, 109:9-110:16.) ProSpine serviced some of the same surgeons and hospitals as Vortex. (SOF ¶¶ 24, 29; RSOF ¶¶ 24, 29;

---

[12] *See supra* note 3.
[13] *See supra* notes 2-3.
[14] *See supra* notes 2-3.

Long Dep. 147:4-150:17; Schaefer Dep. 128:6-138:12.)[15] For example, ProSpine serviced surgeon John Steck, M.D. (SOF ¶ 30; RSOF ¶ 30; O'Hara Dep. 118:24-119:10; Robertson Dep. 59:1-10; 60:1-62:10, 67:9-69:21.) Dr. Steck was the largest customer of Vortex. (SOF ¶ 37; RSOF ¶ 37; ASOF ¶ 22; RASOF ¶ 22.)

There remain disputes of fact as to whether or not ProSpine used the same office space, email address, and computers as Vortex. (SOF ¶ 24; RSOF ¶ 24;[16] ASOF ¶ 116; RASOF ¶ 116; Lirette Dep. 34:23-25, 25:2-5, 114:3-119:20; Long Dep. 134:14-16, 194:23-195:25; O'Hara Dep. 21:10-20, 90:10-24, 109-1-3, 126:10-21, 128:5-129:1, 136:4-8, 207:2-17, 235:6-7, 253:12-20; Schaefer Dep. 84:25-86:18, 115:17-23; Email, May 22, 2014, Dkt No. 77, Ex. 6; Email, May 30, 2014, Dkt No. 77, Ex. 7; Emails, May 12, 2014 – June 30, 2014, Dkt No. 85, Ex. I.)

### e. Post-EDA Activities

It remains disputed whether or not Mr. Long supported ProSpine's activities, engaged in the spinal medical products business, or encouraged Globus's former hospital and surgeon clients to reduce their use of Globus products. (ASOF ¶¶ 112-13, 126, 128; RASOF ¶¶ 112-13, 126, 128.) Of particular note, it remains disputed whether or not Mr. Long encouraged Dr. Steck to use products being sold by ProSpine or Spinal Innovations. (ASOF ¶ 122; RASOF ¶ 122; Steck 24:2-7.) Since the termination of the EDA, Mr. Long has had multiple meetings, dinners, and conversations with Dr. Steck; though, the parties dispute whether such meetings were of a business or social nature. (SOF ¶ 32; RSOF ¶ 32; Long Dep. 114:6-120:25.)

On May 2, 2014, Mr. Long texted Dr. Steck the word "Biomet." (SOF ¶ 33; RSOF ¶ 33; Long to Steck Text Messages, Apr. 6, 2014 – July 13, 2014, Dkt No. 77, Ex. 10.) Dr. Steck testified that he understood the text message to mean that Mr. Long "thought he was going to be

---

[15] *See supra* notes 2-3.
[16] *See supra* notes 2-3.

able to work and sell Biomet products." (John Steck, December 4, 2014, Dkt No. 85, Ex. D [hereinafter Steck Dep.] 61:18-62:4.) Following the termination of the EDA, Dr. Speck stopped using Globus as his main product supplier. (SOF ¶ 37; RSOF ¶ 37; Steck Dep. 21:16-22:13.) For example, between May 2014 and December 4, 2014, Dr. Steck used Globus, Biomet, and other spinal implant products. (SOF ¶ 36; RSOF ¶ 36; Steck Dep. 49:5-50:3, 51:15-52.) Then, after Globus terminated the EDA, Dr. Steck began using the spinal implant products sold by Mr. O'Hara and Mr. Schaefer, including Biomet products. (ASOF ¶ 121; RASOF ¶ 121; Steck 22:1-23:2; Robertson 73:22-25; Schaefer 43:3-5.)

In May 2014, Mssrs. Long, O'Hara, Brown, and Robertson discussed going into business together. (SOF ¶ 26; RSOF ¶ 26; Michael Brown, July 22, 2014, Dkt No. 85, Ex. K [hereinafter Brown Dep.] 37:16-39:9; Long Dep. 159:12-25, 160:1-19; Robertson Dep. 102:12-104:10, 152:1-7.) Between May and June, 2014, Mr. Long texted various former representatives of ProSpine and Spinal Innovations; the parties dispute whether these text messages refer to the sale of spinal implant products or to the maintenance of Globus products. (SOF ¶ 38; RSOF ¶ 38; Long to O'Hara Text Messages, Apr. 1, 2014 – June 25, 2014, Dkt No. 77, Ex. 15; O'Hara to Long Text Messages, Apr. 18, 2014 – July 15, 2014, Dkt No. 77, Ex. 16; Lirette Text Messages, Apr. 18, 2014 – July 18, 2014, Dkt No. 77, Ex. 16.)

On August 27, 2014, counsel for Plaintiff wrote to Defendants requesting that Vortex immediately "assign all of its rights and benefits under any and all No Competition and Non-Disclosure Agreements…to Globus…pursuant to Section 5.5 of the Exclusive Distributor Agreement…between Long, Vortex, and Globus." (SOF ¶ 39; RSOF ¶ 39; Ltr., Aug. 27, 2014, Dkt No. 85, Ex. M.) This Letter was referencing, in part, the assignment of Mr. O'Hara's and

Mr. Schaefer's NCND Agreements. (SOF ¶ 39; RSOF ¶ 39.) There is no dispute that Vortex refused to assign the NCND Agreements.

The Court notes that all "disputed facts" alleged by Defendants concerning Plaintiff's alleged misappropriation of Defendants' trade secrets, and Mssrs. Paul and Kienzle alleged Synthes plan are entirely irrelevant for the purposes of this case. (ASOF ¶¶ 86-100.)

### f.   Present Action

Plaintiff has sued Vortex Spine, LLC and Mr. Long for (Count I) breach of contract for violation of the EDA, (Compl. ¶¶ 72-78), (Count II) unfair competition for misappropriation of trade secrets, proprietary and confidential information of Globus, (Compl. ¶¶ 79-82), and (Count III) tortious interference with prospective economic advantage. (Compl. ¶¶ 84-89.) Plaintiff requests partial summary judgment as to Count I and permanent injunction thereto compelling Defendants to assign the NCND Agreements to Globus. (MSJ at 2.) Plaintiff does not move for summary judgment as to the damages calculation thereto. Defendants argue that disputed facts exist as to whether the EDA is enforceable and whether Defendants breached the EDA. (Resp.)

The Court finds that the EDA is unambiguous, enforceable as written, and that there is no dispute of fact that Defendants violated the terms of the EDA during the course of the EDA. However, the Court finds that there remain disputes of material fact as to whether or not Defendants violated the EDA during the period after the termination of the EDA. Thus, the Court grants in part and denies in part Plaintiff's Motion for Summary Judgment as described herein.

### III.   Discussion

Plaintiff alleges three specific ways in which Defendants breached the EDA: (1) Mr. Long sold products from other companies engaged in the medical products business without express written consent from Plaintiff during the Term of the EDA in violation of EDA Section

5.1.2; (2) Mr. Long assisted ProSpine after the termination of the EDA in violation of EDA Section 5.1.2, and (3) Vortex refused to assign the NCND Agreement in violation of EDA Section 5.5.[17] The Court addresses each issue in turn.

As an overarching matter, the Court again affirms the law of the case that the EDA's choice of law provision, requiring the Court to apply Pennsylvania law, is enforceable. *See Globus Medical Inc. v. Vortex Spine, LLC*, 2014 WL 3700347, at *4 (E.D. Pa. 2014).

### a. The Court grants summary judgment to Plaintiff as to the issue of whether or not Mr. Long violated EDA Section 5.1.2.

To find a breach of contract claim under Pennsylvania law, the facts must show (1) the existence of a contract, (2) a breach of a duty imposed by the contract, and (3) resultant damages. *Omicron Sys., Inc. v. Weiner*, 860 A.2d 554, 564 (Pa. Super. Ct. 2004).

### i. The existence of a contract: the EDA is enforceable.

### 1. The EDA is unambiguous.

To be an enforceable contract, (1) the parties must reach a mutual understanding, (2) the parties must exchange consideration, and (3) the contract must delineate the terms of the bargain with sufficient clarity. *Foreman v. Chester-Upland Sch. Dist.*, 941 A.2D 108, 114 (Pa. Cmwlth. 2008). The parties do not dispute that first two criteria are readily met. (*See* Long Dep. 83:108.)

---

[17] In the Complaint, Plaintiff arguably also alleged a claim that Mr. Long violated EDA Section 5.1.1. Section 5.1.1 states that during the Term of the Agreement, a Principal, like Mr. Long, "shall not...become a proprietor....of any entity in the continental United States which engaged in the medical products business..." (EDA § 5.1.1.) Defendants argue that the plain reading of this section is that Mr. Long was prevented from becoming, in the future, the proprietor of a new medical product business. However, Defendants contend, this forward-looking language does not contemplate a situation in which Mr. Long had already become, in the past, the proprietor of a medical products business. (Resp. at 18.) Defendants explain that M.I. Spine was created in 2008. (Resp. at 18.) Thus, M.I. Spine was already in existence when the EDA was signed. "Shall is a future tense verb, and, as such, cannot be applied to any prior business or entities already in creation." (Resp. at 18.) In its Reply, in response to this argument, Plaintiff pivots and argues that Mr. Long breached the EDA in contravention of Section 5.1.2. (Rep. at 2-3.) Plaintiff does not address any argument relating to the breach of Section 5.1.1. Thus, as to the issue of whether or not Mr. Long breached the EDA as to Section 5.1.1, the Court does not grant summary judgment.

Rather, Defendants argue that the EDA is unenforceable as it did not delineate the terms of the bargain with sufficient clarity. The Court must make a preliminary inquiry as to whether the contract before it is ambiguous. *Stenadardo v. Fed. Nat'l Mortg. Ass'n*, 991 F.2d 1089, 1094 (3d Cir. 1993). A contract is ambiguous where there are two reasonable alternative interpretations of its language. *Id.* "When a contract's terms are 'clear and unambiguous, the intent of the parties is to be ascertained from the document itself.'" *Kamco Indus. Sales, Inc. v. Loveyjoy, Inc.*, 779 F. Supp. 2d 416, 427 (E.D. Pa. 2011) (quoting *Ins. Adjustment Bureau, Inc. v. Allstate Ins. Co.*, 905 A.2d 462, 468 (Pa. 2006) (internal citations omitted)). "Wherever reasonable, the manifestations of intention of the parties to a promise or agreement are interpreted as consistent with each other and with any relevant course of performance, course of dealing, or usage of trade." *Kamco Indus. Sales, Inc.*, 779 F. Supp. 2d at 427 (quoting *Sunbeam Corp. v. Liberty Mut. Ins. Co.*, 781 A.2d 1189, 1193 (Pa. 2001) (internal citations omitted)). "Where the intention of the parties is clear, there is no need to resort to extrinsic aids or evidence, instead, the meaning of a clear and unequivocal written contract must be determined by its contents alone." *Bohler-Uddeholm Am., Inc. v. Ellwood Grp., Inc.*, 247 F.3d 79, 92 (3d Cir. 2001). Simply put, if the contract can only be read one way, the court should interpret it as a matter of law. *Hullett v. Towers, Perrin, Forster & Crosby, Inc.*, 38 F.3d 107, 111 (3d Cir. 1994).

"However, when an ambiguity exists, parole evidence is admissible to explain or clarify or resolve the ambiguity, irrespective of whether the ambiguity is patent, created by the language of the instrument, or latent, created by extrinsic or collateral circumstances." *Kamco Indus. Sales, Inc.*, 779 F. Supp. 2d at 427 (internal citations omitted). Simply put, if the contract is ambiguous, interpretation of the contract should be left to a factfinder to resolve the extrinsic evidence with the contract's language. *Hullett*, 38 F.3d at 111.

The Court analyzes the language in the EDA that Defendants contend is ambiguous. Defendants argue that the EDA is ambiguous as to the term that restricts Mr. Long's sales of competing products. The EDA states: "Distributor, nor Principals....shall directly or indirectly...[d]uring the Term of this Agreement, manufacture, sell, market or deliver any product, or participate in any manner in such activities, if such product is manufactured, sold, marketed or distributed by any company of its affiliates engaged in the medical products business without the written consent of [Plaintiff]." (EDA § 5.1.2(A).) The overarching title of this section is "No Competition-Competing Products." (EDA § 5.1.2.) Defendants argue that the term "Competing Products" is vague and ambiguous. (Resp. at 21.) This argument is a red herring.

The title heading "Competing Products" is not relevant to the Court's analysis of the ambiguity of the EDA. The title heading is not the content of the EDA. The content, the actual language of the contract, is quite clear. The explicit language of Section 5.1.2(A) clarifies that it is not the "product" that matters, but rather, the "company" manufacturing, selling, marketing, or distributing the product that matters. This section clearly explains that companies that are implicated by the provision include any company "engaged in the medical products business." (EDA § 5.1.2(A).) There is no need to define "[c]ompeting [p]roducts" because that definition is not integral to the prohibition against competition. The Court finds that EDA Section 5.1.2 is not ambiguous.

Defendants ask the Court to consider evidence that Plaintiff knew about Mr. Long's M.I. Spine activities prior to signing the EDA. Even if that were true, it would be immaterial as the signed EDA does not evince any evidence of such knowledge. Further, the EDA explicitly disavowed any prior agreements:

> This Agreement, and any exhibits hereto, constitutes the entire Agreement between the parties relating to the matters covered by this Agreement, supersedes all prior agreements, whether written or oral and shall control over any other statement, representation or agreement by the Company.

(EDA § 10.7.) Thus, while there does remain a dispute of fact as to whether or not Plaintiff knew about M.I. Spine before signing the EDA, this dispute is not material. The Court finds that EDA Section 5.1.2 is unambiguous and reflects the entire agreement of the parties. The Court cannot consider parole evidence of agreements, either written or oral, that the parties had before the EDA. Section 5.1.2 is enforceable.

## 2. EDA Section 10.8 is enforceable.

There remains a dispute of fact regarding whether Plaintiff knew about Mr. Long's M.I. Spine activities during the Term of the EDA. Defendants argue that Plaintiff knew, and thus, (1) waived its right to enforce EDA Section 5.1.2 because Plaintiff continued to fulfill its contractual obligations, despite its knowledge of Mr. Long's putative breach, and (2) the parties made a novation on the EDA. (Resp. at 16-18.) The Court finds that this dispute of fact is not material because the EDA expressly explains that a waiver of any provision, and any modification to the EDA, can only be effectuated in writing:

> No waiver by either party or any breach by the other party or any provision thereof shall be deemed to be a waiver of any later or other breach thereof or as a waiver of any other provision of this Agreement or consent to any subsequent breach. This Agreement may not be waived, changed, discharged or terminated orally or by any course of dealing between the parties, but only by an instrument in writing signed by the party against whom the waiver, change, discharge or termination is sought.

(EDA § 10.8.) This language is not ambiguous, and it is enforceable. There is no dispute of fact that Plaintiff never consented in writing to change any of the terms of the EDA.

## ii. Mr. Long breached EDA Section 5.1.2.

There is no dispute of fact that Mr. Long sold bone grafting material during the Term of the EDA. Defendants argue that they did not violate the terms of the EDA because they only sold

bone grafting material, and not "spinal hardware." (Resp. at 21.) Section 5.1.2 does not limit the

non-competition prohibition to only "spinal hardware." The provision is clear that the prohibition

extends to any "product" manufactured, sold, marketed, or distributed by a company "engaged in

the medical products business." (EDA § 5.1.2.) A company selling bone grafting material plainly

fits this definition. There is no dispute of fact that they sold bone grafting material. Given that

bone grafting material is plainly a "medical product," Defendants violated the terms of the EDA.

### iii.  Plaintiff can show damages.

Plaintiff requests that the Court delay its determination of damages. Defendants argue

that the EDA forecloses Plaintiff any opportunity to recover monetary damages. (Resp. at 24.)

The EDA states that

> Distributor and Principals recognize and acknowledge that the limitations set forth in this
> Section 5 are properly required for the adequate protection of the business of Company,
> and that violation of any of the provision of this Section 5 will cause irreparable injury
> for which money damages are neither adequate nor ascertainable. According, Company
> shall have the right to have the provisions of this Section 5 specifically enforced by a
> court of competent jurisdiction, including without limitation its rights to terminate this
> Agreement, in addition to any other remedies which Company may have..."

(EDA § 5.4.)

Defendants ask the Court to read this provision to mean that Plaintiff "is prohibited from

bringing monetary damages claims." (Resp. at 24.) This interpretation requires that the Court

stop reading before the provision explicitly states that in addition to specific performance,

Plaintiff can also seek "any other remedies which Company may have." This provision does not

foreclose Plaintiff's ability to recover monetary damages.

### iv.  Conclusion

The Court grants Plaintiff's motion for summary judgment as to the issue of whether or

not Mr. Long violated EDA Section 5.1.2 by selling bone grafting products through M.I. Spine

during the term of the EDA. The Court does not resolve the issue of damages thereto at this time.

    **b.  The Court denies Plaintiff's Motion for Summary Judgement on the issue of whether Mr. Long violated EDA Section 5.1.2 after the termination of the EDA. There remain material disputes of fact regarding Mr. Long's activities after the termination of the EDA that preclude the granting of summary judgment.**

EDA Section 5.1.2 requires that Mr. Long shall not "manufacture, sell, market or deliver any product, or participate in any manner in such activities, if such product is manufactured, sold, marketed or distributed by any company or its affiliates engaged in the medical products business without the express written consent of Company...during the two (2) year period after the termination of the Agreement...for any reason whatsoever. However, during the Post-Termination Restriction Period, these restrictions shall only preclude the above activity in the Territory with any companies engaged in the spinal products business...includ[ing]...companies engaged in providing medical products or services associated with the spine." (EDA § 5.1.2.) Defendants argue that summary judgment is inappropriate because (1) this covenant not to compete is unenforceable and (2) even if it were enforceable, Mr. Long did not breach the covenant not to compete. (Resp. at 15-21.) The Court finds the second argument dispositive and does not address the first.

There remain a multitude of material disputes of fact remain as to whether or not Mr. Long assisted ProSpine after the termination of the EDA. It remains disputed whether or not Mr. Long supported ProSpine's activities, engaged in the spinal medical products business, or encouraged Globus's former hospital and surgeon clients to reduce their use of Globus products. (ASOF ¶¶ 112-13, 126, 128; RASOF ¶¶ 112-13, 126, 128.) Material dispute of facts remain regarding the content and context of conversations between Mr. Long and Dr. Steck. (SOF ¶¶ 32-33; RSOF ¶¶ 32-33; ASOF ¶ 122; RASOF ¶ 122; Steck 24:2-7; Long Dep. 114:6-120:25), and conversations between Mr. Long and former representatives of ProSpine and Spinal

Innovations. (SOF ¶ 38; RSOF ¶ 38; Long to O'Hara Text Messages, Apr. 1, 2014 – June 25, 2014, Dkt No. 77, Ex. 15; O'Hara to Long Text Messages, Apr. 18, 2014 – July 15, 2014, Dkt No. 77, Ex. 16; Lirette Text Messages, Apr. 18, 2014 – July 18, 2014, Dkt No. 77, Ex. 16.) The Court cannot grant summary judgment as to any claim relating to Mr. Long's activities with ProSpine or Spinal Ventures after the termination of the EDA.

      **c.   The Court grants summary judgment insofar as the Court finds that Vortex breached EDA Section 5.5 by failing to assign its rights to Mr. Schaefer's NCND Agreement upon request by Plaintiff. The Court denies summary judgment as to the claims that Mr. Long failed to assign his rights to Mr. Schaefer's or Mr. O'Hara's NCND Agreements, as the Court cannot definitively find that the EDA imposed any such requirement on Mr. Long. The Court further denies summary judgment as to the claims that Vortex or Mr. Long failed to assign their rights to Mr. O'Hara's NCND Agreement as Mr. Long's NCND Agreement was signed directly with Plaintiff.**

          **1.   The Court grants summary judgment as to the claim that Vortex breached the EDA in refusing to assign Mr. Schaefer's NCND Agreement to Plaintiff.**

EDA Section 5.5 requires that, "at [Plaintiff's] request," Vortex must "assign all of its rights and benefits under any such NCND Agreements" to Plaintiff. (EDA § 5.5) There is no material dispute of fact that on August 27, 2014, Plaintiff requested that Vortex assign its rights to Mr. Schaefer's NCND Agreement to Plaintiff, and that Vortex refused. (SOF ¶ 39; RSOF ¶ 39; Ltr., Aug. 27, 2014, Dkt No. 85, Ex. M.) Thus, it is undisputed that Vortex has breached its contractual duties to Plaintiff under EDA Section 5.5. Defendants, however, make two arguments that Plaintiff cannot recover due to this breach: (1) Plaintiff failed to raise this demand in its Complaint, (2) the NCND Agreement is unenforceable because (a) Vortex is no longer in the spinal implant distribution business, and (b) the Louisiana Supreme Court has held that Mr.

Schaefer's NCND Agreement is unenforceable under Louisiana law, and (c) the covenant not to compete is not enforceable. (Resp. at 26-29.)

First, Defendants argue that Plaintiff is precluded from requesting assignment of Mr. Schaefer's NCND Agreement because Plaintiff did not raise this issue in its Complaint. (Resp. at 11.) Defendants are correct that Plaintiff did not specifically raise the issue of Vortex's refusal to assign the NCND Agreements in the Complaint. There is an obvious answer to why that is the case. The Complaint in this case was filed on June 2, 2014. (Compl.) Vortex's refusal to assign the NCND Agreements occurred after August 27, 2014. (Pl.'s Mot. for TRO, Dkt No. 27, at 2 n. 2.) Thus, the Complaint does not directly address Vortex's refusal to assign the NCND Agreements, as such refusal had not yet occurred.

However, the Court finds that the Complaint appropriately contemplates this requested relief in its Claim One breach of contract claim. The Complaint explained that Plaintiff requires all of its exclusive distributors and sales representatives to execute NCND Agreements. (Compl. ¶ 20.) The Complaint also alleged that Defendant had breached the EDA "by filing in Louisiana state court, in contravention of the Agreement." (Compl. ¶ 76.) The Louisiana state court was filed by the Vortex Sales Representatives whose NCND Agreements are at issue here. *O'Hara et al. v. Globus Medical Inc. et al.*, 2014 CW 143R. Thus, the Complaint alleged that Defendants had breached the EDA and that one example of that breach related to the NCND Agreements. Thus, Defendants were properly on notice regarding this claim. While Plaintiff is requesting relief that was not demanded in the Complaint, this relief necessarily flows from Claim One as alleged in the Complaint. A "final judgment should grant the relief to which each party is entitled, even if the party has not demanded that relief in its pleadings." Fed. R. Civ. P. 54(c).

Second, Defendants' final arguments all concern whether or not, once assigned, Mr. Schaefer's NCND Agreement is enforceable. That issue in not before the Court today. The narrow question for the Court on this motion is whether or not Vortex breached EDA Section 5.5 by failing to assign its rights and benefits to Mr. Schaefer's NCND Agreement to Plaintiff. For the purposes of deciding this Motion, the Court need not consider whether or not Plaintiff could, in fact, enforce Mr. Schaefer's NCND Agreement. Mr. Schaefer is not a party to this lawsuit. Any enforcement of the NCND Agreement would occur in a separate lawsuit. Simply put, this case is not about Mr. Schaefer's NCND Agreement, but rather, about the EDA.

In conclusion, the Court has found that the EDA is enforceable. EDA Section 5.5 states that Vortex must assign its rights and benefits to Mr. Schaefer's NCND Agreement to Plaintiff upon request. Plaintiff requested. Vortex refused. These facts are all undisputed. Vortex has breached EDA Section 5.5. The appropriate remedy for this breach is specific performance. The Court orders Vortex to assign its rights and benefits to Mr. Schaefer's NCND Agreement, per the requirements of EDA Section 5.5.

### 2. The Court denies summary judgment as to the claim that Mr. Long failed to assign his rights to either Mr. O'Hara's or Mr. Schaefer's NCND Agreements.

The Court finds that Mr. Long cannot be ordered to assign his rights to the NCND, since he has no rights to the NCND Agreements. The EDA states that the "Distributor" is required to make all sale representatives sign the NCND Agreements. (EDA § 5.5.) The EDA further states that the "Distributor agrees to assign all of its rights and benefits under any such NCND Agreements to [Plaintiff]." (EDA § 5.5.) "Distributor" is defined as "Vortex Spine, LLC." (EDA at 1.) Mr. Long is defined as a "Principal." (EDA at 1.) The assignment provision is clearly only applicable to Vortex, not Mr. Long. The Court cannot grant summary judgment on this issue as to Mr. Long.

**3. The Court denies summary judgment as to the claim that either Mr. Long or Vortex failed to assign their rights to Mr. O'Hara's NCND Agreement.**

Mr. O'Hara's NCND Agreement is "between Globus Medical, Inc. (the "Company") and Patrick O'Hara ("the Employee")." (O'Hara NCND Ag. at 1.) Neither Vortex, nor Mr. Long, are parties to Mr. O'Hara's NCND Agreement. The EDA requires Vortex to "assign all of its rights and benefits under any such NCND Agreements." (EDA § 5.5.) "[S]uch NCND Agreements" is defined as the sample at Ex. D of the Agreement. (EDA at Ex D.) In the sample, the NCND Agreement is between a "company" that is "engaged in the sale of products and services for spine surgery...including the exclusive sales and distribution of products ("Globus Products") and an agent of said "company." (EDA at Ex. D.) In contrast, in Mr. O'Hara's, the "company" is Globus. (O'Hara NCND Ag. At 1.) In contrast to the language in the NCND Agreement referred to in the EDA, in Mr. O'Hara's NCND Agreement, it states that the "company," "is engaged in the design, development, production, distribution and sale of products and services for spine surgery." (O'Hara NCND Ag. ¶ A.) Mr. O'Hara's NCND Agreement is plainly not "such" NCND Agreements as contemplated in the EDA. Simply put, Mr. Long and Vortex cannot assigns any "rights or benefits" in Mr. O'Hara's NCND Agreement, because they have none. The Court, therefore, cannot grant summary judgment on this claim.

**4. Conclusion**

The Court grants summary judgment in favor of Plaintiff insofar as the Court finds that Vortex breached the EDA by failing to assign Plaintiff the NCND Agreement of Mr. Schaefer. The Court's attending Order requires Vortex to assign its rights to Mr. Schaefer's NCND Agreement to Plaintiff. The Court denies summary judgment as to any finding that Mr. Long

must assign his rights to the NCND Agreements, or that Vortex must assign its rights to Mr. O'Hara's Agreement.[18]

### IV.    Conclusion

The Court grants Plaintiff's Motion for Partial Summary Judgment insofar as: (1) the Court holds that Mr. Long breached EDA Section 5.1.2 through his activities with M.I. Spine during the Term of the EDA, though the Court does not determine the damages for said breach at this time; (2) the Court holds that Vortex breached EDA Section 5.5 by failing to assign Mr. Schaefer's NCND Agreement to Plaintiff upon request, and the Court grants specific performance for said breach. The Court denies Plaintiff's Motion in all other respects.

BY THE COURT:

/s/ C. Darnell Jones, II

_____

C. Darnell Jones, II    J.

---

[18] The Court notes that Plaintiff requests that the Court order assignment of "any and all No Competition and Non-Disclosure Agreements." The Court finds this request too broad. The only evidence of a NCND Agreement between Vortex and any agent is Mr. Schaefer's NCND Agreement. The Court limits its award of specific performance to only Mr. Schaefer's NCND Agreement.